IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

IN RE INTEREST OF BAILEY M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BAILEY M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

RACHEL M., APPELLANT, AND JOHNNY M., APPELLEE.

Filed November 12, 2024.    No. A-24-135.

Appeal from the County Court for Platte County: C. JO PETERSEN, Judge. Affirmed.

Ryan J. Stover, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellant.

Emilee Higgins, of Law Office of E. Higgins, L.L.C., and Breanna Flaherty, Platte County Attorney, for appellees State of Nebraska and guardian ad litem.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

I. INTRODUCTION

Rachel M. appeals from an order of the Platte County Court, sitting as a juvenile court, which order terminated her parental rights to her minor child, Bailey M. The county court found that termination of Rachel's parental rights was proper under Neb. Rev. Stat. § 43-292(5), (6), and (7) (Reissue 2016) and was in Bailey's best interests. Upon our de novo review of the record, we affirm.

- 1 -

## II. BACKGROUND

### 1. PARTIES

Rachel is the biological mother of Bailey, born in August 2013. Johnny M. is Bailey's legal father, as he was married to Rachel at the time of Bailey's birth. However, genetic testing revealed that he is not, in fact, Bailey's biological father. During the lower court proceedings, the county court terminated Johnny's rights as Bailey's legal father. He has not appealed this determination and, as a result, is not a subject of this appeal.

Rachel and Bailey have lived with Daniel Felber, Rachel's on-again, off-again boyfriend, since Bailey was 3 months old. Daniel believed he was Bailey's biological father until approximately 2020 when paternity testing revealed otherwise. Even after the testing, Daniel continued to provide care for Bailey until her removal from Rachel's custody. He had regular visitation with Bailey during the lower court proceedings. However, because he is not Bailey's biological father, he is also not a subject of this appeal. Bailey's biological father remains unknown. This appeal involves only Rachel's parental rights to Bailey.

### 2. PROCEDURAL BACKGROUND

On the morning of March 11, 2021, Rachel dropped then 7-year-old Bailey off at school, drove to the Loup River Bridge, and jumped into the river. She was uninjured in the fall and was able to, eventually, pull herself out of the river and drive home. Witnesses to her actions called law enforcement who came to Rachel's home on the evening of March 11. After assessing Rachel's mental health, it was determined that she needed to be placed in emergency protective custody at a psychiatric facility. Because no one was available to care for Bailey in Rachel's absence, she was placed in the temporary custody of the Department of Health and Human Services (the Department).

On March 15, 2021, the State filed a juvenile petition alleging that Bailey was a juvenile as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition contained the following allegations: that Rachel had been taken into emergency protective custody after attempting suicide by jumping off of a bridge into the river; that Rachel was unable to identify any family members or friends that were able to care for Bailey in Rachel's absence; and that Bailey is in a situation injurious to her health, safety, morals, or well-being. At a hearing held on April 5, Rachel denied the allegations in the State's petition. The county court continued Bailey's placement outside of Rachel's home.

At a subsequent hearing on May 3, 2021, the county court ordered that Rachel was to have supervised visitation with Bailey. A few days after this hearing, Rachel motioned the court "to enter an Order establishing placement of the minor child with [Rachel] or, in the alternative, an Order allowing [Rachel] to exercise [unsupervised] parenting time with the minor child." While Rachel's motion was still pending, the county court entered an order suspending her visitations with Bailey entirely, based on the recommendation of the assigned Department caseworker.

On July 19, 2021, Rachel pled no contest to the allegations in the State's petition and Bailey was adjudicated as a child within the meaning of § 43-247(3)(a). At this time, Rachel was still not permitted to have any visitation with Bailey. In late August or early September, Rachel and Bailey began having therapeutic visitation sessions. In April 2022, Rachel was also permitted to have

supervised telephonic visitations with Bailey. Then, in August 2022, the therapeutic visits were transitioned to supervised visits in the community.

After Bailey was adjudicated to be within the meaning of § 43-247(3)(a), Rachel was ordered by the county court in February 2022 to complete a rehabilitation plan. The tenets of that case plan included, completing an updated psychological evaluation and parenting assessment; meeting with a psychiatrist monthly to manage her mental health medications; participating in individual therapy; being honest with her health care providers about the status of her mental health; and participating in visitation with Bailey.

On November 2, 2022, the State filed a supplemental petition seeking termination of Rachel's parental rights pursuant to § 43-292(5), (6), and (7). As to § 43-292(5), the petition alleged that Rachel is unable to discharge her parental responsibilities due to mental illness or mental deficiency and that there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period. As to subsection (6), the petition alleged that reasonable efforts had been made to preserve and reunify the family, but Rachel failed to correct the conditions leading to Bailey's adjudication. And, as to subsection (7), the petition alleged that termination was appropriate because Bailey had been in an out-of-home placement for 15 or more months of the most recent 22 months. Finally, the petition alleged that terminating Rachel's parental rights was in the best interests of Bailey.

3. TERMINATION TRIAL

A trial was held on the motion to terminate Rachel's parental rights in August and September 2023. At the hearing, the State called four witnesses to testify. Two of these witnesses, Ginger Darveau and Carrie Jaixen, testified regarding Bailey's behaviors at school both prior to and after her removal from Rachel's home in March 2021. The State's third witness, Mallory Swantek, was Rachel's therapist at the time of her suicide attempt in March 2021. Summer Jones was the current Department case worker assigned to Bailey's case. The State also offered the deposition testimony of Dr. Mark Hannappel, a psychologist who performed a psychological evaluation and parenting assessment on Rachel. In addition to these witnesses, Rachel called her current therapist, Cynthia Oltmer, and Daniel to testify. She also testified on her own behalf. We summarize the testimony of all the witnesses below.

(a) Rachel's Mental Health

The majority of the evidence presented at the termination trial focused on Rachel's mental health and how her struggle to maintain her mental health affected her ability to appropriately and effectively parent Bailey. The evidence presented at the trial revealed that in the months leading up to Bailey's removal from Rachel's home in March 2021, Rachel's mental health was deteriorating. Swantek began seeing Rachel for therapy in October 2020. At that time, Rachel was suffering from disassociation, memory problems, anxiety, panic attacks, urges to self-harm and thoughts of suicide, and intrusive thoughts regarding the trauma she experienced due to extreme abuse during her childhood. Swantek diagnosed Rachel as suffering from major depressive disorder and post-traumatic stress disorder.

Initially, Rachel attended therapy with Swantek one time per week, but because she was reporting thoughts of suicide and was relying on a crisis hotline multiple times per week, Swantek

increased her therapy to two times a week. Unfortunately, Rachel's attendance at therapy was inconsistent and sporadic. During one therapy session in late February or early March 2021, Rachel brought an 8-to-12-inch hunting knife with her and told Swantek she planned to use the knife to "slice" her wrists during their session. Swantek eventually talked Rachel into giving her the knife without harming herself.

After Rachel jumped off of the bridge and was hospitalized for 2 weeks in March 2021, Swantek recommended that Rachel engage in a higher level of care such as a residential treatment center. Swantek did not believe that Rachel was making progress toward regulating her emotions in weekly outpatient therapy. Rachel did not agree to attending an inpatient program. In addition, Rachel refused to sign a release so that Daniel, her Department caseworker, or Bailey's therapist could be provided with updates about her mental health. In April 2021, Rachel was again involuntarily hospitalized in a psychiatric facility.

In May 2021, Rachel chose to see a new therapist, Oltmer. Oltmer diagnosed Rachel as suffering from four mental health conditions: major depressive disorder, which manifests in Rachel as an inability to feel motivated to complete even mundane day-to-day activities; post-traumatic stress disorder, which has resulted in Rachel struggling to trust people and dissociating from reality; borderline personality disorder, which affects Rachel's ability to connect and trust others, increases her fear of abandonment, and causes her to struggle with regulating her emotions; and anxiety disorder. Oltmer believed that many of Rachel's mental health issues stemmed from the abuse she experienced as a child, both in her own home and in foster homes. Oltmer identified eye movement desensitization and reprocessing as a potential treatment for Rachel, but Rachel has not yet become stable enough in her emotional regulation to participate in this type of therapeutic intervention.

During Oltmer's trial testimony, she described how Rachel has shown periods of improvement with her mental health, but has also demonstrated a great deal of regression. In fact, in April 2023, almost 2 years after Oltmer began working with Rachel, Rachel was involuntarily hospitalized in a psychiatric facility again. She was released, then returned to another psychiatric hospital 1 week later.

After this latest hospitalization, Rachel finally agreed to enter an inpatient residential facility, like Swantek had recommended 2 years prior. At the time of the trial, Rachel was residing in a residential facility, where she is attending programming to assist her with independent living skills; engaging in dialectical behavioral therapy; participating in art therapy; managing her medication through a psychiatrist; and attending community meetings. Oltmer believed that Rachel's ability to regulate her emotions had improved significantly since entering the facility. Rachel testified that she is learning to open up to people and be honest about her mental health struggles. She is trying to make better choices and to find coping mechanisms to regulate her emotions. However, Rachel had only been at the facility for approximately 2 months prior to the trial. She was projected to remain in the facility for an additional 4 to 7 months. During her trial testimony, Rachel thought she would probably be released from the facility in February 2024.

(b) Results of Psychological Evaluation and Parenting Assessment

Prior to Rachel entering the residential treatment center, she participated in a court-ordered psychological evaluation and parenting assessment with Hannappel. Although the county court

first ordered Rachel's participation with these evaluations in February 2022, the evaluations were not completed until July 2022 due to Rachel's noncompliance. At Rachel's first appointment with Hannappel in April 2022, she was completely uncooperative and refused to answer even simple questions about her background. In addition, Rachel would not sign a release so that Hannappel could review Oltmer's therapeutic notes. In his deposition, Hannappel believed that Rachel's behavior was indicative of the severity of her mental health problems.

When Rachel returned to Hannappel's office on May 12, 2022, she cooperated with the interview and psychological testing, but Hannappel believed that she was minimizing the severity of her mental health problems.

> When considering her lengthy history of serious problems with her psychiatric and psychological symptoms, including 2 psychiatric hospitalizations in 2021, it is not likely that her symptoms have abated as she tried to present for this evaluation. Her interactions with the undersigned during the interview on 4-22-2022 support the contention that she continues to experience significant psychiatric and psychological symptoms that interfere with her adult functioning, including her ability to parent Bailey.

Hannappel was, apparently, correct in this belief that Rachel was not being forthcoming about her mental health, as Rachel testified at the termination hearing that she was not truthful with him during the May 2022 interview. She explained that at that time, she felt very depressed and was having suicidal thoughts, but hid that from him.

Ultimately, Hannappel believed that Rachel was showing symptoms of bipolar 1 disorder, post-traumatic stress disorder, anxiety disorder, and panic disorder. He was very concerned that she was not currently taking any medication for her symptoms and that she had, apparently, not done so for the past 2 years. Notably, the county court had previously ordered Rachel to see a psychiatrist in order to manage any necessary medication for her mental health conditions.

While Hannappel did not find that Rachel had any intellectual deficiencies, he did opine that she lacked insight into basic parenting knowledge. He also opined that given her mental health conditions, she would continually struggle to make Bailey's needs her priority. Given Rachel's history of mental health problems and her history of not being honest with professionals about those problems, Hannappel thought it unlikely that Rachel would be able to appropriately care for Bailey in the long term. In order to do so, Rachel would have to consistently and continuously manage her mental health symptoms, which she had demonstrated an inability to do: "As an adult, Rachel has limited ability to manage her own affairs let alone the affairs of Bailey." In his report, Hannappel concluded:

> The undersigned's primary concern about [Rachel] being able to be an adequate parent to Bailey is whether she sufficiently and consistently manages her psychiatric conditions. As noted in the previous evaluation, Rachel has a lengthy history of psychiatric treatment dating back to childhood. She has had numerous episodes of serious deterioration in her adult psychiatric functioning that have required psychiatric hospitalization. She was psychiatrically hospitalized 2 times in 2021. At the time of the most recent evaluation, she reported that she was not taking any psychiatric medications and had not done so for about 2 years. In the previous evaluation completed by the undersigned, it was noted that she has a history of not consistently following psychiatric and psychological recommendations.

Since she has a history of not consistently managing her psychiatric and psychological conditions, this remains the primary concern about Rachel being able to be an adequate parent to Bailey. Those involved in Bailey's care need to be aware of this pattern in Rachel's history and how it could be repeated, which would again place Bailey's well-being in jeopardy. The undersigned cannot predict the future, but there is an apparent pattern of deteriorations in Rachel's functioning when she does not adequately manage her psychiatric conditions.

(c) Visitation and Its Effect on Bailey

Besides Rachel's mental health struggles, the second main focus of the termination trial was Bailey's behavioral issues and how such issues were affected by Bailey having contact with Rachel. Even prior to Bailey's removal from Rachel's home in March 2021, she was struggling at school due to her behavioral problems. When Bailey began kindergarten in August 2019, the school immediately observed Bailey to engage in inappropriate language, a refusal to follow directions, hitting staff members, and attempting to leave her classroom. As a result of Bailey's extreme behaviors, the school implemented an alternative schedule for her. At the beginning of kindergarten, Bailey only attended school from 8 a.m. to 10 a.m. each day. As her behaviors improved, the school gradually increased the amount of time she would attend school every day.

By the start of Bailey's first grade year, she was attending school all day. The school established an individualized education plan (IEP) for Bailey. Darveau, the elementary school counselor, testified that Rachel regularly attended IEP meetings for Bailey and appeared engaged and invested in Bailey's education. In addition, according to Darveau, Rachel had reached out to community based services to assist her in meeting Bailey's educational needs.

In March 2021, when Bailey was 7 years old and in the second semester of first grade, she was placed in foster care. Immediately after Rachel was released from the psychiatric hospital after her suicide attempt, she was permitted to have supervised visitation with Bailey. However, after attending these visits, Bailey ran away from her foster home on two occasions. The first such time occurred in the middle of the night. When she was found, Bailey reported that Rachel had told her to run away from the foster home using a window. Due to these occurrences, Bailey moved to a different foster home and her visits with Rachel were suspended by the county court in May 2021.

Bailey's visits with Rachel were still suspended when she started second grade in August 2021. Darveau testified that Bailey did very well during the first semester of second grade. During that semester, Bailey began having therapeutic visitation with Rachel. Then, during the second semester of that year, Bailey began to have telephonic visits with Rachel. According to Darveau, when the telephonic visits were instituted, Bailey's behavior at school worsened. During the second semester of her second grade year, Bailey demonstrated aggressive behaviors toward the school's staff and her classmates and she struggled to control her emotions. Ultimately, Bailey was suspended from school for making threats to harm some of her classmates and for hitting those classmates.

Around the same time that Bailey started third grade in August 2022, she began to transition from therapeutic visits with Rachel to supervised visits in the community. Jaixen, a special education teacher at Bailey's school, testified that Bailey started her third grade year with good behavior. However, as Bailey's visits with Rachel increased, Bailey's behavior declined

dramatically. During that first semester, Bailey began to have aggressive behaviors, including self-harming. She would have very abrupt mood changes and would often speak in high pitched "baby talk" rather than in her normal voice.

After Hannappel's evaluation of Rachel, he recommended that there be no increase in the amount of time Rachel was currently permitted to see Bailey. He believed that Rachel's mental health needed to be stabilized before she should be allowed to have any additional visitation time. In late 2022, Bailey's visits with Rachel were decreased to only 2 hours per week, and Bailey's behavior began to improve. By December 2022, Bailey was happier, was following class rules, was showing no signs of aggression, and was performing well academically.

When Bailey and Rachel had supervised visits, it was reported that those visits were not always productive. Jones, the family's caseworker at the time of the termination trial, testified that Rachel and Bailey spent a lot of time on their cell phones during visits. In addition, Rachel demonstrated an inability to properly redirect Bailey when she acted out, she was overly concerned with the visitation supervisor, and she sometimes yelled at people in the community. In addition, by the first part of 2023, Rachel stopped communicating with Jones altogether and did not respond to the school's request to set up an annual IEP meeting. Ultimately, an educational surrogate had to be appointed for Bailey.

At the termination trial, Jones opined that termination of Rachel's parental rights was in Bailey's best interests. Jones explained that Bailey is in need of permanency, structure, and consistency so that she can continue to regulate her emotions, progress academically, and learn to be a positive classmate. According to Jones, Rachel simply cannot provide Bailey with the structure and consistency that she needs. In fact, Rachel has not demonstrated that she can appropriately parent Bailey for more than 2 hours at a time.

### (d) Rachel's Witnesses

Contrary to the evidence presented by the State, Rachel presented the testimony of herself and Daniel to demonstrate that she was a positive influence in Bailey's life. At the trial, Daniel testified that Rachel has a very strong bond with Bailey. He indicated that he observed Rachel to offer comfort to Bailey, to be affectionate with her, and to compliment Bailey on her attributes. In addition, Daniel explained that Rachel spent a lot of time with Bailey when Bailey was still in their home. Rachel would read to Bailey, play games with her, attend her medical appointments, discipline her, feed her, help her with her homework, and participate in her educational meetings. Daniel did acknowledge that while Rachel and Bailey lived in his home, he was only present for 2 or 3 days every couple of weeks due to his employment as an over the road truck driver. Similarly, Rachel testified that she has a bond with Bailey, that she misses Bailey, and that she wants to be a good parent to Bailey.

### 4. JUVENILE COURT ORDER

At the close of the evidence, the county court took the matter under advisement. On January 25, 2024, the court issued its order terminating Rachel's parental rights to Bailey. In the order, the county court highlighted the difficulty presented by the circumstances of this case. Because, while Rachel clearly loves Bailey and wants to parent her, she "is simply unable to provide proper care for Bailey and is unable to provide a stable, structured, consistently safe home for Bailey on a long

term, regular basis" due to her "serious mental health issues." The court also noted that the testimony and evidence very clearly indicated that Rachel's contact with Bailey "was detrimental to Bailey in many ways."

The county court ultimately concluded that statutory grounds existed for the termination of Rachel's parental rights pursuant to § 43-292(5), (6), and (7) and that termination of her parental rights was in Bailey's best interests.

Rachel appeals from the county court's decision to terminate her parental rights.

## III. ASSIGNMENTS OF ERROR

Rachel first assigns as error the county court's determination that statutory grounds existed to warrant the termination of her parental rights. Specifically, she argues that there was insufficient evidence presented to prove that termination was warranted pursuant to § 43-292(5) and (6). She does not, however, challenge the facts underlying the court's determination that termination was also warranted pursuant to § 43-292(7). In Rachel's next assigned error, she asserts that the county court erred in finding that the State presented clear and convincing evidence to demonstrate that Bailey's best interests required termination of her parental rights.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. To terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of the evidence concerning the State's other bases for termination. *Id.*

### 1. STATUTORY GROUNDS

The State sought termination of Rachel's parental rights under § 43-292(5), (6), and (7). The county court found that the State proved that Bailey was a minor child within the meaning of each of § 43-292(5), (6), and (7) by clear and convincing evidence. On appeal, Rachel challenges the court's findings that Bailey was a child within § 43-292(5) and (6). She does not challenge the court's finding that Bailey was also a child within § 43-292(7). Upon our de novo review, we agree with the county court that termination of Rachel's parental rights is warranted pursuant to § 43-292(7).

Section 43-292(7) allows for termination of parental rights if the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. The Nebraska

Supreme Court has held that this subsection operates mechanically, and thus, it does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Mateo L. et al., supra.*

In this case, Bailey had been in an out-of-home placement for 15 or more months of the most recent 22 months as of the time of the termination trial. More precisely, she was removed from Rachel's care in March 2021. Since that time, she remained in a foster home. As of the first day of the termination trial in August 2023, Bailey had been in out-of-home placement for more than 28 months, or almost 2½ years. Accordingly, the requirements of § 43-292(7) were met.

Having found that there is clear and convincing evidence that termination of Rachel's parental rights was warranted pursuant to § 43-292(7), we need not address the sufficiency of the evidence to demonstrate that termination was also warranted pursuant to § 43-292(5) or (6).

### 2. BEST INTERESTS

Having declined to address the sufficiency of the evidence demonstrating that termination was also appropriate pursuant to § 43-292(5) or (6), we treat our discussion of whether termination of Rachel's parental rights is in Bailey's best interests as though § 43-292(7) is the only statutory basis for termination. When termination is based solely on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). This is because § 43-292(7) does not require proof of any specific fault by the parent, such as abandonment, neglect, unfitness, or abuse, as other subsections require. *In re Interest of Aaron D., supra.*

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id*.

The law does not require perfection of a parent. *Id*. Instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*. The Supreme Court has recognized that one's history as a parent speaks to one's future as a parent. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

Rachel argues that the State failed to present sufficient evidence proving that termination of her parental rights was in Bailey's best interests. She further argues that the progress she made during the pendency of the case and the bond that she shares with Bailey demonstrate that she is a fit parent. We disagree.

The evidence presented at the termination trial reveals Rachel has suffered from pervasive mental health issues for some time. These mental health issues resulted in Rachel attempting to commit suicide by jumping off of a bridge into a river in March 2021. Given her mental state, Rachel was hospitalized and was unable to care for Bailey. According to the evidence, Rachel remained unable to care for Bailey for the duration of the juvenile court proceedings. Her mental health remained tenuous, and she largely refused to treat her condition in an appropriate manner.

Early on in the case, Rachel's therapist recommended that she seek out an inpatient treatment center, which could better address her serious mental health problems than weekly outpatient therapy. Rachel refused to attend inpatient treatment and, instead, chose to see a new therapist. Professionals involved with Rachel's care recommended that she see a psychiatrist and begin taking medication for her condition. In fact, in February 2022, the court ordered Rachel to engage in such medication management. Rachel refused.

When Rachel participated in a psychological assessment and parenting evaluation during the first half of 2022, she admitted to lying to Hannappel about her mental health condition in order to present herself in a positive light. However, even with Rachel's deception, Hannappel believed she was experiencing significant symptoms that rendered her incapable of being an effective and appropriate parent for Bailey. After this evaluation, Rachel's condition continued to deteriorate until she was again involuntarily hospitalized in a psychiatric facility on multiple occasions in April 2023. Only after these hospitalizations did Rachel agree to finally attend inpatient treatment, more than 2 years after it was initially recommended. Additionally, Rachel's decision to enter inpatient treatment came more than 6 months after the State had filed its motion to terminate her parental rights to Bailey.

While we applaud Rachel's ultimate decision to enter inpatient treatment and take the necessary steps to work on her mental health, we cannot ignore that the decision came after Bailey had been in an out-of-home placement for more than 2 years. We also cannot ignore that by the time of the termination hearing in the Fall of 2023, it was projected that Rachel's inpatient treatment program would require her participation for approximately 6 more months. And, after treatment she would still need additional time to demonstrate an ability to maintain her mental health outside the structured confines of her treatment center. The evidence presented at the termination trial revealed that Rachel has a history of making progress and then showing significant regression. As such, she would need to demonstrate her ability to maintain her mental health in the long term before any type of reunification with Bailey could be considered.

Essentially, the evidence demonstrated that even after the juvenile court proceedings had been pending for 30 months, Rachel was still not in a position to be an appropriate parent for Bailey. At the time of the termination trial, her mental health status remained fragile, and she was not ready to live on her own, let alone care for a young child. When a parent is unable or unwilling to rehabilitate herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Shane L. et al.*, 21 Neb. App. 591, 842 N.W.2d 140 (2013). We note the difficulty presented by this case, given that while Rachel has always been willing to be a parent for Bailey, her mental health condition simply makes her unable to be there for her child.

We recognize that Rachel and Bailey share a strong bond with each other and they both desire to be reunited. However, in addition to ongoing concerns about Rachel's mental health, there are also serious concerns about the effect of Rachel's involvement in Bailey's life on Bailey's mental health and well-being. The evidence presented at the trial revealed a distinct correlation between poor behavior and the amount of time Bailey spent with Rachel. When Bailey was not seeing Rachel at all or when their visits were limited to weekly 1-hour therapy sessions, Bailey thrived both in school and at her foster home. She demonstrated academic progress and stability. However, when Bailey's visits with Rachel increased and were removed from a therapeutic setting, Bailey's behaviors deteriorated quickly. She acted out in school, even being suspended for levying

threats of physical violence against her classmates. She also acted out violently in her foster home. Such evidence suggests that Bailey's relationship with Rachel was not that of a healthy mother and daughter.

Based on all of the evidence presented at the termination trial, we do not find that the county court abused its discretion in finding that termination of Rachel's parental rights was in Bailey's best interests. The evidence demonstrates that Rachel is currently not a fit parent for Bailey and it is not clear when, or if, she will become a fit parent. Bailey has been in a foster home, without permanency, for more than 2½ years. She needs, and deserves, stability in her life. Unfortunately, it is not clear that Rachel will ever become capable of giving Bailey what she needs. As such, we affirm.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the county court terminating Rachel's parental rights to Bailey.

AFFIRMED.